JUSTICE AGEE
delivered the opinion of the Court.
The City of Suffolk (“the City”) appeals the judgment of the Circuit Court of the City of Suffolk affirming the determination of the Board of Zoning Appeals for the City of Suffolk (“BZA”) that certain land use rights became vested with respect to a parcel of land owned by Etheridge Manor Corporation (“Etheridge”). For the reasons set forth below, we will affirm the trial court’s judgment.
I. FACTS AND PROCEEDINGS BELOW
In 1985, Etheridge purchased a tract of approximately 164 acres in the City of Suffolk (“the Property”). In conjunction with an adjoining landowner, Etheridge planned to develop the combined tracts of 310 acres as a planned unit development known as King’s *141 Landing. In June 1988, at the request of Etheridge and the adjoining landowner, the Suffolk City Council rezoned the 310 acres from “Rural Residential” to “Planned Development Housing” (“PD-H”) and approved the Master Land Use Plan Etheridge submitted for the development. The Master Land Use Plan reflected a mixed-use and mixed-density development including medium and high-density residential areas, as well as commercial parcels.
The adjoining landowner encountered financial difficulties, including foreclosure, which delayed a joint development of the project. Etheridge decided to proceed independently and engaged an engineering firm to review the development options for the Property in 1993.
In 1994, Etheridge requested that approximately 10 acres of the Property be rezoned from “PD-H” to “General Business.” At the same time, Etheridge submitted amendments to the 1988 Master Land Use Plan to change the proposed residential development areas from mixed density to low density for the remaining 154 acres of the Property. In August 1994, the Suffolk City Council approved the rezoning of the 10-acre parcel, reduced the density for the remaining 154 acres to four units per acre, and approved the Amended Master Land Use Plan.[1]
In 1995, Etheridge submitted a preliminary recreation plan and a traffic impact analysis based on a full residential development of the Property, which the City approved. In 1996, Etheridge submitted a preliminary subdivision plat for part of the remaining 154 acres of the Property (designated as “Planter’s Station at King’s Landing Section 1, 2 and 3” (“Planter’s Station”)).[2] The Suffolk Planning Commission approved this preliminary plat in March 1996, and granted extensions of time for submission of the final Planter’s Station plat to April 1998. The extensions were requested to accommodate the engineering design for the entire Property relating to sewer, water, storm drainage, and related items since the Planter’s Station portion was part of an integrated infrastructure for the whole Property.
*142 In 1997, Etheridge deeded 1.1 acres of the Property, without compensation, to the Virginia Department of Transportation (“VDOT”) for road improvements adjacent to the Property. In April, 1998, Etheridge filed a final plat for Planter’s Station, but no action had been taken on it before enactment by the City of the Uniform Development Ordinance (“UDO”) on September 1, 1999.
The City’s enactment of the UDO changed the zoning classification of land throughout the city of Suffolk. The UDO effectively rezoned all of the Property, other than the 10-acre commercial section, from “PD-H” to “Commerce Park” and “Office-Institutional.” After the City adopted the UDO, Etheridge requested a determination by the City’s Zoning Administrator that it had vested rights in the PD-H zoning for the 154 acres. The Zoning Administrator determined that Etheridge had vested rights in the Planter’s Station section, but not in the remaining portion of the 154 acres (“the Remainder”), which was the bulk of the Property. In effect, this determination meant that Etheridge could not develop the Remainder as residential property, but only as an office or commerce park, despite its contiguous location to Planter’s Station.
Etheridge appealed the Zoning Administrator’s decision to the BZA, which reversed the Zoning Administrator’s determination and held that Etheridge had vested rights in the PD-H zoning designation for the Remainder. The trial court granted the City a writ of certiorari pursuant to Code § 15.2-2314 to review the BZA decision.
The trial court affirmed the BZA’s decision finding that the 1988 rezoning was a “significant affirmative governmental act” under Code § 15.2-2307 upon which Etheridge reasonably relied in good faith. The trial court further found that Etheridge had expended substantial funds in diligent pursuit of the project and that those expenditures were for development of the entire Property. This appeal by the City follows.
II. STANDARD OF REVIEW
The decision of a board of zoning appeals is presumed to be correct on appeal to a circuit court; the appealing party bears the burden of showing that the board applied erroneous principles of law or that its decision was plainly wrong and in violation of the purpose and intent of the zoning ordinance. Bd. of Zoning App. v. Bond, 225 Va. 177, 179-90, 300 S.E.2d 781, 782 (1983); Allegheny Enterprises v. Covington, 217 Va. 64, 67, 225 S.E.2d 383, 385 (1976). A circuit court decision *143 affirming a board of zoning appeals determination is also accorded this presumption of correctness on appeal to this Court. Natrella v. Board of Zoning Appeals, 231 Va. 451, 456, 345 S.E.2d 295, 299 (1986).
Masterson v. Bd. of Zoning App., 233 Va. 37, 44, 353 S.E.2d 727, 732-33 (1987).
Our standard of appellate review is well established. A circuit court’s judgment is presumed to be correct and we will not set that judgment aside unless it appears from the record that the judgment is plainly wrong or unsupported by the evidence. Ravenwood Towers, Inc. v. Woodyard, 244 Va. 51, 57, 419 S.E.2d 627, 630 (1992); Code § 8.01-680.
III. ANALYSIS
Prior to 1998, this Court’s decisions had determined when landowners acquired vested rights in uses of their property where the zoning status of that property was changed to prohibit a previously permitted use.
Privately held land is subject to applicable local zoning ordinances whether enacted before or after the property was acquired. Generally, landowners have no property right in anticipated uses of their land since they have no vested property right in the continuation of the land’s existing zoning status. However, in limited circumstances, private landowners may acquire a vested right in planned uses of their land that may not be prohibited or reduced by subsequent zoning legislation.
Board of Zoning Appeals v. CaseLin Systems, Inc., 256 Va. 206, 210, 501 S.E.2d 397, 400 (1998) (internal citations omitted).
In 1998, the General Assembly enacted substantial changes to Code § 15.2-2307 that established certain criteria which, when satisfied, conclusively vest property rights in a landowner regardless of changes in an otherwise applicable zoning ordinance.
[A] landowner’s rights shall be deemed vested in a land use and such vesting shall not be affected by a subsequent amendment to a zoning ordinance when the landowner (i) obtains or is the beneficiary of a significant affirmative governmental act which remains in effect allowing development of a specific *144 project, (ii) relies in good faith on the significant affirmative governmental act, and (iii) incurs extensive obligations or substantial expenses in diligent pursuit of the specific project in reliance on the significant affirmative governmental act.
Code § 15.2-2307. The case at bar presents our first examination of the legislative changes to Code § 15.2-2307.
The City avers in this appeal that the trial court was plainly wrong in applying the statutory criteria to the record evidence in this case. Specifically, the City contends that there was not sufficient evidence in the record that Etheridge was “the beneficiary of a significant affirmative governmental act . . . allowing development of a specific project.” In the alternative, the City argues that Etheridge did not incur “extensive obligations or substantial expenses in diligent pursuit of the specific project.” We disagree with both contentions.
A. Significant Affirmative Governmental Act
The trial court found that the 1988 rezoning of the Property to PD-H was a “significant affirmative governmental act.” The City acknowledges that such a rezoning meets the new criteria in subsection (ii) of the second paragraph of Code § 15.2-2307 whereby “rezoning for a specific use or density” is “deemed to be a significant affirmative governmental act.” However, the City contends that the 1988 rezoning was not for “development of a specific project” as required by subsection (i) of the Code section’s first paragraph. Therefore, the City argues that no “deemed vesting” had occurred.
The City cites Town of Rocky Mount v. Southside Inv., Inc., 254 Va. 130, 487 S.E.2d 855 (1997), and Board of Supervisors of Chesterfield County v. Trollingwood Partnership, 248 Va. 112, 445 S.E.2d 151 (1994), for the proposition that development plans in great detail are required before a property owner can obtain vested rights in a land use classification. The City implies that these cases establish that Etheridge’s King’s Landing project is too vague to be deemed a “specific project” under Code § 15.2-2307, although the statute does not define “specific project” and the cases never mention that term.
Southside Inv., Inc., Trollingwood Partnership and other pre-1998 cases involved determining whether “a significant governmental act” had occurred with respect to the properties at issue which accorded vested land use rights to the landowners despite later zoning changes. In these cases a controlling factor was the issuance *145 of a specific government land use authorization, beyond zoning, before vesting of a particular land use could be found. For instance, in Snow v. Amherst County Board of Zoning Appeals, 248 Va. 404, 448 S.E.2d 606 (1994), we held that “[t]he mere reliance on a particular zoning classification, whether created by ordinance or variance, creates no vested right in the property owner.” 248 Va. at 408, 448 S.E.2d at 608-09. However, the plain language of current Code § 15.2-2307 now makes clear that vested rights accrue when one of the six types of actions listed in the second paragraph of that Code section occurs. Such acts are deemed to constitute “significant affirmative governmental acts allowing development of a specific project,” including “rezoning for a specific use or density” as in the case at bar.
In Southside Inv., Inc., the landowner’s property was rezoned to permit the construction of duplex residences. In reliance on that zoning, the landowner constructed a street and utility infrastructure to develop both sides of the street and completed duplex construction on one side. The landowner had not filed a site plan to develop the other side of the street when the zoning was changed to prohibit duplexes. We found no vested rights in the prior zoning and deemed it dispositive that no “site plan or permit for the undeveloped portion of the property” had been issued prior to the change in zoning, therefore no significant governmental act had occurred as to that property. 254 Va. at 133, 487 S.E.2d at 857.
Similarly, the fact that no site plan had been filed, as required by the landowner’s special use permit, was determinative in Trollingwood Partnership and we held that no vesting had occurred in the preexisting zoning. The landowner’s property was zoned for trailer park use which it was developing in sections. The undeveloped parcel for which vested rights were asserted was subject to a special use permit which contained a condition precedent that a site plan be filed. The landowner had not filed a site plan when the zoning changed to prohibit a trailer park on the disputed property. We found that no vesting had occurred because the required governmental act, approval of the site plan had not occurred. 248 Va. at 115-16, 445 S.E.2d at 153.
While these cases involved general plans of development, as opposed to a detailed ready-to-build plan, that factor was not the basis of the Court’s decisions. In Southside Inv., Inc., Amherst County Board of Zoning Appeals and Trollingwood Partnership we found that the respective property owners had no vested rights *146 because no significant government act (as our precedent then defined it) had taken place since the subject land lacked site plan approval, a special use permit, or something similar. The current statute’s reference to “development of a specific project” is nowhere mentioned in these decisions and this concept was not discussed in our holdings. Any distinction due to the general versus the specific nature of a landowner’s development plans was unrelated to whether a significant governmental act, such as approval of a site plan, had occurred.
Nonetheless, the City argues that a “specific project” can only be found under Code § 15.2-2307 when “they would have filed site plans for the entire property.” No such requirement exists in the statute and, for the reasons just enunciated, neither does it derive from our prior precedent.
The record reflects that the BZA and trial court were cognizant that the object of the 1988 rezoning was a specific tract known as King’s Landing; it was not a general rezoning. The project was restricted to PD-H zoning and that approval specifically limited the number of residential units. Further, through the 1988 and 1994 master land use plans, the highway entrances, general roadways, and recreation areas were established, as well as designated residential and commercial use sections. The record supports the implied conclusion of the trial court and BZA that the rezoning was directed to a specific project.
Code § 15.2-2307 now specifically recognizes the type of zoning act taken by the City in 1988 as a significant affirmative governmental act creating a deemed vesting of land use rights. The record reflects that the zoning was specifically directed to an identifiable property and project. Thus, there was credible evidence in the record to support the trial court and BZA conclusions that the statutory requisite of “a significant affirmative governmental act . . . allowing development of a specific project” occurred. Therefore, we do not find the trial court’s determination plainly wrong.
B. Substantial Expenses in Diligent Pursuit
The City also assigns error to the trial court’s determination that Etheridge was “in diligent pursuit” of the King’s Landing project and incurred “substantial expenses” in that diligent pursuit. We find that the record supports the trial court’s judgment and therefore do not find it plainly wrong.
*147 (i) Diligent Pursuit
The City contends Etheridge cannot claim diligence because it did practically nothing regarding the project from the 1988 rezoning until the 1994 rezoning and approval of the amended master land use plan. Had the UDO been adopted in 1994, instead of 1999, the City’s argument would likely prevail. However, Etheridge’s lack of diligence before 1994 is not dispositive since the BZA and trial court could consider all of Etheridge’s development activity prior to the UDO zoning change. In that context, the trial court and BZA correctly found that Etheridge was reasonably diligent.
Whether due to the adjoining landowner’s financial problems, general economic conditions, or whatever reason, Etheridge did not begin measurable steps to develop ICing’s Landing until 1993, when its engineer evaluated the development options. From that point until adoption of the UDO, Etheridge undertook a series of activities to develop the whole Property, as the trial court’s letter opinion reflects.
The record shows a train of regular, although not constant, events occurring in the period of some [14] years between the purchase of the property and the adoption of the UDO. I am unable to find that the evidence fails to support the conclusion of the BZA that Etheridge Manor exercised a “good faith, reasonable effort” toward the full development of the whole tract of land. I cannot find that the BZA was plainly wrong.
In reliance on the 1988 rezoning of the Property to PD-H, Etheridge undertook the 1993 engineering analysis and commenced development activities with the 1994 rezoning and amended master land use plan. The City approved the revised plan and rezoned the Property from high-density residential to an overall density of only four units per acre. Since, at that point, Etheridge was proceeding alone, it was necessary to reestablish the demarcation of the development from the land of the adjoining landowner through a survey and a re-subdivision plat which were filed and approved in 1995. Etheridge also completed a comprehensive traffic impact analysis for development of the entire Property in 1994, which was reviewed by the City and later approved by VDOT. In 1997, Etheridge deeded 1.129 acres to VDOT, without compensation, for road improvements to access the Property.
*148 Etheridge undertook to develop a plan for recreational use, which the City approved in 1996, to dedicate certain recreational areas within the Property. Etheridge also developed the entrance phase, Planter’s Station, with the preliminary subdivision plats filed in 1996 and approved by the City. The final Planter’s Station Subdivision plat, which included sewer, water, and storm drainage tied to development of the whole Property, was timely filed on April 17, 1998, but never acted upon by the City prior to the adoption of the UDO a year and a half later. Obviously, Etheridge was at a distinct disadvantage in efforts to proceed with development of the Remainder until the City approved the entrance phase of the subdivision.
Since the record reflects credible evidence sustaining the trial court’s finding that Etheridge diligently pursued development of the entire Project (including the Remainder), we cannot say its decision was plainly wrong.
(ii) Substantial Expenses
The City does not contest the uncontroverted evidence in the record that Etheridge expended over $158,000 between 1993 and 1998 toward development of the Property. However, the City argues that most of these expenditures were limited to the development of Planter’s Station and that there is no nexus between those expenses and the development of the Remainder. Therefore, the City maintains the expenditures were not substantial and could not vest land use rights in the PD-H zoning in the Remainder.
The trial court made specific findings, both in its letter opinion and order, that Etheridge’s expenditures for the traffic study, conveyance to VDOT, the recreation plan, the engineering with regard to certain aspects of the Planter’s Station plats, and the master land use plan were for the development of the entire Property, not exclusively for Planter’s Station or the 10-acre commercial area. The record reflects credible evidence to support this finding.
In particular, the engineer for Etheridge opined, without contradiction, that the actions undertaken by Etheridge were for the benefit of the entire Property.
The subdivision plats and construction drawings depicting Sections 1, 2 and 3 [Planter’s Station] are designed to serve as part of the entire 480-unit project, and their scope greatly exceeds the needs of the initial area to be developed. The pump station is designed to serve the entire project. The BMP *149 is larger than required for the initial sections, and is designed to tie into a larger system. The storm drainage system is calculated to handle more storm draining than that generated by the initial area. The interior road system is designed to serve traffic needs exceeding those generated by the initial area.
The City has now changed the zoning on the balance of Etheridge Manor’s residential property to Commerce Park, but has left Sections 1, 2 and 3 zoned PD-H. This makes no sense, since Sections 1, 2 and 3, standing alone, cannot be developed in an economically feasible manner. Because of the rezoning that has occurred, the infrastructure for Sections 1, 2 and 3 is overdesigned for those sections alone. The design and layout of Sections 1, 2 and 3 were totally dependent on the subsequent residential development contemplated by the development plan.
The City’s counsel conceded as much at trial: “Admittedly, the infrastructure for those three areas (Planter’s Station) was built big enough so that they could eventually hook it up to the full property when built out.”
The record reflects credible evidence that Etheridge’s expenditures were for development of the Property as a whole and verifies the determinations of the trial court and the BZA were not plainly wrong. Accordingly, we find no error in the trial court’s judgment.
IV. CONCLUSION
The record reflects credible evidence to support the findings of the BZA and the trial court that PD-H land use rights vested in Etheridge as to the Remainder. We find that neither the trial court nor the BZA was plainly wrong in determining that the PD-H zoning was a significant affirmative governmental act and that Etheridge incurred significant expenditures in diligent pursuit of the King’s Landing project. Finding no error, we will affirm the trial court’s judgment.[3]

*150
Affirmed.

 The 1988 Master Land Use Plan, and the 1994 amended version, which continued to identify the project as King’s Landing, show the general location of primary roads, recreation areas, waterways, and entrances to state highways. Neither plan contained specific details as to lot locations, curb, gutter, utilities, residential streets, or storm drainage facilities. The rezonings and land use plans did fix the number of available residential units on the Property.

 Planter’s Station was to be an entrance to King’s Landing and the first section to be built out.

 The City also assigned error claiming the trial court erred in finding that approval of the preliminary plat for Planter’s Station created vested rights in Etheridge as to the Remainder. We do not read the trial court’s decision to make such a holding. Neither the trial court’s letter opinion nor its order indicated any causative nexus between approval of the plat for Planter’s Station and the vesting of rights in the Remainder. The trial court noted the vested rights of Etheridge in Planter’s Station were the same vested rights it acquired in the Remainder, but *150 there was no cause and effect relationship. Accordingly, we do not address this assignment of error as it was based on the City’s erroneous reading of the trial court’s decision.